NO _____
A.M. _____ PM _____

**OCT 1 6 2015**

CHRISTOPHER D. RICH, Clerk
By SANTIAGO BARRIOS
DEPUTY

Jason R.N. Monteleone
JOHNSON & MONTELEONE, L.L.P.
405 South Eighth Street, Suite 250
Boise, Idaho 83702
Telephone: (208) 331-2100
Facsimile: (208) 947-2424
*jason@treasurevalleylawyers.com*
Idaho State Bar No. 5441

Attorneys for Plaintiff

## IN THE DISTRICT COURT OF THE FOURTH JUDICIAL DISTRICT FOR THE

## STATE OF IDAHO, IN AND FOR THE COUNTY OF ADA

| | |
|---|---|
| JACOB ANDERSEN, <br><br> Plaintiff <br><br> v. <br><br> GENERAL MOTORS, L.L.C., <br><br> Defendant | Case No.  **CV PI  1517850** <br><br> **COMPLAINT AND DEMAND FOR JURY TRIAL** |

COPY

### COMPLAINT

Plaintiff, Plaintiff Andersen, brings this action individually against Defendant, General Motors, L.L.C. ("GM"):

**I.     Summary of Claims**

1.     This is an action for strict liability for a defective product, negligence, and fraudulent concealment.  Mr. Andersen brings this action for injuries he sustained in a motor vehicle collision of a 2005 Chevrolet Cobalt and 1994 Chevrolet Blazer on

COMPLAINT AND DEMAND FOR JURY TRIAL -- 2

October 18, 2013.

    2.    GM is one of the largest car and truck manufacturers in the United States. It designed and manufactured the Chevrolet Cobalt that is at issue in this case, along with over two million other similar cars. All of these cars contained the same or substantially similar safety-related defects.

    3.    More than eight years before Plaintiff's injuries, GM knew about the safety-related defects in the Chevrolet Cobalt, and did nothing to recall or fully remedy the defects or warn users about them. Rather, GM intentionally, purposely, fraudulently, and systematically concealed the defects from Plaintiff, the National Highway Traffic Safety Administration ("NHTSA"), and the driving public.

    4.    GM's misconduct subjects it to liability under Idaho law.

    5.    GM's misconduct, fraudulent concealment, and systematic concealment of the safety-related defects toll the applicable statutes of limitations and statute of repose that might otherwise be applicable to this action.

    **II.    Parties, Jurisdiction, and Venue**

6.    At all relevant times herein mentioned, Plaintiff has been and currently is, a resident of Canyon County, Idaho.

    7.    GM is a Delaware limited liability company doing business in all fifty states with its principal place of business in Detroit, Michigan. GM does business in this judicial district and maintains a registered agent here as well. GM is the successor corporation to General Motors Corporation ("GMC"), which underwent bankruptcy in 2009. Through that bankruptcy and asset sale from GMC to GM, GM assumed the liabilities of GMC as

COMPLAINT AND DEMAND FOR JURY TRIAL -- 3

set out herein.  GM may be served via its registered agent CSC of Ada County, 12550 W.
Explorer Drive, Suite 100, Boise, ID 83713.

8.      GM is subject to the personal jurisdiction of this Court

9.      This Court has subject matter jurisdiction over this case.

10.      Venue is proper in this district as GM does business in this district
and maintains its registered agent in this district.

**III.    Facts**

**The Wreck and Plaintiff's Injuries**

11.      On October18, 2013, Plaintiff was driving his 1994 Chevrolet Blazer at the
speed limit on State Highway 19 in Canyon County, Idaho.  He was wearing his
lap/shoulder belt.  At around 3:24 a.m., as Plaintiff was returning home after work, the
driver of a 2005 Chevrolet Cobalt lost control of his vehicle and collided head on with
Plaintiff.

12.      Because of the nature of the crash, the known safety defects in the
Chevrolet Cobalt, which was being driven by Amador Cortinas, caused the key in that
motor vehicle to turn from the run to accessory/off position as it was being driven in
Canyon County, Idaho.  Once the key turned, the engine shut off.  As a result of the engine
shutting off, control was lost of the Chevrolet Cobalt, it traveled over the center line, and
collided with Plaintiff's motor vehicle which was traveling in the opposite direction.  The
safety-related defects in the Chevrolet Cobalt caused the airbags in Plaintiff's car not to
deploy.

14.      Plaintiff suffered severe injuries as a result of this collision.

COMPLAINT AND DEMAND FOR JURY TRIAL -- 4

**GM's Knowledge of Safety-Related Defects in The Chevrolet Cobalt and Its Concealment of Them**

15.     The 2005 Chevrolet Cobalt has safety-related design defects. First, a low torque detent in the ignition switch allows the key to be inadvertently turned from the run to accessory/off position.  Second, because of the low position of the key lock module on the steering column, a driver can inadvertently bump the key fob or chain which results in the key turning from run to the accessory/off position. Third, the key sold with the Cobalt has a slot design which allows the key fob or chain to hang lower on the key and increases the chance of the key inadvertently moving from the run to accessory/off position during ordinary driving maneuvers. The design of the ignition switch, position of the key lock module, and slot design of the key are hereinafter referred to as the "Key System."

16.     In the late 1990s/early 2000s, GM and a supplier, Eaton Mechatronics ("Eaton"), completed the specifications for the ignition switch for the Chevrolet Cobalt. Eaton sold its vehicle switch/electronic division to Delphi Automotive Systems ("Delphi") on March 31, 2001.

17.     A pre-production report for the 2005 Chevrolet Cobalt identified issues with the ignition switch.  In a section entitled "Root Cause Summary" the report states that the "two causes of failure" were "low contact force and low detent plunger force." Although the report states that a design change resolved the problem, any purported design change did not resolve the problem.

18.     In 2001, during developmental testing of the 2005 Chevrolet Cobalt, GM learned that the engines in those cars were stalling due to defects in the Key System.

COMPLAINT AND DEMAND FOR JURY TRIAL -- 5

GM chose not to fix these defects.

19.     In February 2002, Delphi submitted a Production Part Procedure Process ("PPAP") document for the ignition switch in the 2005 Cobalt.  According to Delphi officials, GM approved the PPAP even though testing of the ignition switch torque was below GM's performance specifications.

20.     In 2002, GM began manufacturing and selling 2003 Chevrolet Cobalts with the defective Key System.

21.     In 2004, GM engineers reported that the ignition switch on the Chevrolet Cobalt was so weak and so low on the steering column that the diver 's knee could easily bump the key and turn off the car.

22.     This defect was sufficiently serious for a GM engineer, in January 2004, as part of GM's vehicle evaluation program, to affirmatively conclude, in writing, that "[t]his is a basic design flaw and should be corrected if we want repeat sales."

23.     In 2004, GM began manufacturing and selling the 2005 Chevrolet Cobalt.  The Ion was a sister vehicle (essentially the same car with a different badge or name) to the Chevrolet Cobalt.  GM installed the same Key System on the 2005 Cobalt as it did on the Ion.

24.     On October 29, 2004, around the time of GM's market launch of the 2005 Cobalt, Gary Altman- GM's program-engineering manager for the Cobalt -test drove the Cobalt with the standard key and key fob.  During the test drive, when Altman's knee bumped the key, the engine turned off, causing the engine to stall. Altman reported this incident to GM.

COMPLAINT AND DEMAND FOR JURY TRIAL -- 6

25.    In response to Altman's report, GM launched an engineering inquiry to investigate the potential for the key to move from the "on" to the "accessory/off" position during ordinary driving conditions. This inquiry is known within GM as a Problem Resolution Tracking System Inquiry ("PRTS"). The specific complaint which resulted in the PRTS was that the "the vehicle can be keyed off with knee while driving."

26.    On February 1, 2005, as part of the PRTS, GM engineers concluded:

> There are two main reasons that [sic] we believe can cause a lower effort in turning the key: 1. A low torque detent in the ignition switch. 2. A low position of the lock module in the column. (PRTS – Complete Report N172404).

27.    As part of the PRTS, GM engineers also began looking into ways to solve the problem of the key moving from the "run" to the "accessory/off" position during ordinary driving.

28.    On February 18, 2005, GM engineers presented several possible solutions to the Cockpit Program Integration Team ("CPIT"). GM engineers determined the only "sure solution" to fixing the problem of the key inadvertently moving from the "run" to the "accessory/off" position required changing from a low mount to a high mount lock module, which would considerably reduce the possibility of the key/key fob being impacted by a driver.

29.    According to GM engineers, this change in the key position on the lock module, combined with increasing the detent in the ignition switch, would be a "sure solution." GM, however, through Altman, rejected this "sure solution," in part, because the

COMPLAINT AND DEMAND FOR JURY TRIAL -- 7

cost to implement the solution would be too high.

30.    During this PRTS, GM also considered changing the key from a slot to a hole as a way to attempt to contain this problem, but not as a solution to the problem.

31.    Changing the key from a slot to a hole would reduce the lever arm of the key and the key chain.  With the slot design, the key chain would hang lower on the key which would increase the torque force on the ignition switch when the chain was contacted or moved in any way.  GM engineers determined this key change would significantly reduce the chance of the key inadvertently moving from the "run" to the "accessory/off" position during ordinary driving maneuvers.

32.    A GM engineer conducted a cost analysis of this key change and determined that the cost to make this change would be less than one dollar per vehicle.

33.    GM, however, rejected this proposed key change and, on March 9, 2005, GM closed the PRTS without taking any steps to fix the defective Key System in Ions and Cobalts.  The PRTS detailed the reasons why GM took no action.

> "Per GMXOOl PEM's [Gary Altman] directive we are closing this PRTS with no action. The main reasons are as following:  All possible solutions were presented to CPIT and VAPIR:  a. The lead-time for all the solutions is too long. b.  The tooling cost and piece price are too high.  c. None of the solutions seem to fully countermeasure the possibility of the key being turned (ignition turn off) during driving.  Thus **none of the solutions represents an acceptable business case."** (emphasis added)

34.    On February 28, 2005, GM issued a bulletin to its dealers regarding engine-stalling incidents in 2005 Cobalts and 2005 Pontiac Pursuits (the Canadian version of the Pontiac G5).

COMPLAINT AND DEMAND FOR JURY TRIAL -- 8

35.     The February 28, 2005, bulletin addressed the potential for drivers of these vehicles to inadvertently turn off the ignition due to low key ignition cylinder torque/effort. The Chevrolet Cobalt had the same safety-related defects.

36.     In the February 28, 2005, bulletin, GM provided the following recommendations/instructions to its dealers but not to Plaintiff or the public in general:

> There is potential for the driver to inadvertently turn off the ignition due to low key ignition cylinder torque/effort. The concern is more likely to occur if the driver is short and has a large heavy key chain.
>
> In the cases this condition was documented, the driver's knee would contact the key chain while the vehicle was turning. The steering column was adjusted all the way down. This is more likely to happen to a person that is short as they will have the seat positioned closer to the steering column.
>
> Incases that fit this profile, question the customer thoroughly to determine if this may the cause. The customer should be advised of this potential and to take steps, such as removing unessential items from their key chains, to prevent it.
>
> Please follow this diagnosis process thoroughly and complete each step. If the condition exhibited is resolved without completing every step, the remaining steps do not need to be performed.

37.     At that time, however, GM knew that the inadvertent turning off of the ignition in the vehicles was due to design defects in the Key System in those vehicles, including the Chevrolet Cobalt, and was not limited to short drivers using large heavy key chains.

38.     GM failed to disclose and, in fact, concealed the February 28, 2005, bulletin

– and/or the information contained therein, from Chevrolet Cobalt owners, including Plaintiff, and sent affirmative representations to dealers that did not accurately describe the nature of the problem, the multiple design steps needed for a "sure solution" to the problem and GM's knowledge of it.

39.     Indeed, rather than disclosing this serious safety problem that uniformly affected all Chevrolet Cobalts, GM, instead, concealed and obscured the problems, electing to wait until customers brought their cars to a dealership after an engine-stalling incident, and offered even its own dealers only an incomplete, incorrect, and insufficient description of the defects and the manner in which to actually remedy them.

40.     As of February 2005, GM engineers knew that the Chevrolet Cobalt vehicles had the Key System safety-related defects discussed in this Complaint.

41.     Pursuant to 49 C.F.R. §573.6, which requires an automobile manufacturer to "furnish a report to the NHTSA for each defect related to motor vehicle safety," GM had a duty to disclose the safety-related defects in the Chevrolet Cobalt vehicles.

42.     Instead of complying with its legal obligations, however, GM fraudulently concealed the Key System defect from the public – including the Van Pelts – and continued to manufacture and sell Ions and Cobalts with these known safety defects, causing the Van Pelts to continue to own a vehicle that contained a defective and dangerous Key System.

43.     In March 2005, following its receipt of a customer complaint that the Cobalt vehicle ignition turned off while driving, GM opened another PRTS–Complete Report (0793/2005-US).  Steve Oakley, the brand quality manager for the Cobalt, originated

the PRTS.  As part of the PRTS, Mr. Oakley reviewed an e-mail, dated March 9, 2005,

from Jack Weber, a GM engineer.  The subject of the email was "Cobalt SS Ignition Turn

Off."  In the e-mail, Mr. Weber stated:

> I've had a chance to drive a Cobalt SS and attempt to turn off
> the ignition during heel/toe down shifting.  Much to my
> surprise, the first time I turned off the ignition switch was
> during a normal traffic brake application on I-
> 96. After that I was able to do a static reproduction of
> the condition in a parking lot.  I've attached photos of the
> condition with comments. My Anthropometric Measurements
> are attached below:
>
> Static view of keys, fob and registration hitting knee.
>
> Position of RKE fob during normal driving.  Dynamic
> evaluation.
>
> View of steering column cover and Pass Key 3+"lump" under
> the key slot.
>
> Key in run position, knee contacting the fob and the split ring
> is pulling on the key to move it to the "off" position . Static
> evaluation.
>
> Fob has levered around the steering column cover and turned
> the ignition off.
>
> Unobstructed view of the fob and column cover.
>
> Attached below is documentation of a RAMSIS study
> performed to attempt to duplicate the real world
> condition.
>
> Please call at (586) 986-0622 with questions.
>
> Jack Weber

Weber clearly identified the defects in the Key System, while he was driving the

Cobalt.

COMPLAINT AND DEMAND FOR JURY TRIAL -- 11

44.     Despite the clear evidence of the safety-related defects with the Key System, during the March 2005 PRTS, GM engineers decided not to reconsider any of the proposed solutions discussed during the February 2005 .PRTS. Instead, the GM engineers leading the PRTS recommended that sole corrective action GM should recommend would be to advise customers to remove excess material from their key rings, even though GM knew that the inadvertent turning off of the ignition in these vehicles was due to design defects in the Key System in those vehicles, and was not limited to drivers having excess key ring materials.

45.     In May 2005, GM, following its receipt of another customer complaint that his/her Cobalt vehicle ignition turned .off while driving, it opened another PRTS.

46.     During the May 2005 PRTS, GM decided to redesign the key in order to reduce the possibility that a driver may inadvertently turn the key from the "run" to the "accessory/off" position during ordinary driving.

47.     Despite this initial safety/redesign commitment, however, GM ultimately failed to follow through on its own decision and closed this PRTS without any action, further concealing what it knew from the public and continuing to subject the public to the defective vehicles' serious safety risks.

48.     At or about this same time, GM, through Alan Adler, GM's Manager, Product Safety Communications, issued the following statement with respect to the Chevrolet Cobalt's inadvertent shut-off problems, affirmatively representing in its "Statement on Chevrolet Cobalt Inadvertent Shut-offs" that:

> In rare cases when a combination of factors is present, a Chevrolet Cobalt driver can cut power to the

engine by inadvertently bumping the ignition key to the accessory or off position while the car is running.

When this happens, the Cobalt is still controllable. The engine can be restarted after shifting to neutral.

GM has analyzed this condition and believes it may occur when a driver overloads a key ring, or when the driver's leg moves amid factors such as steering column position, seat height and placement. Depending on these factors, a driver can unintentionally turn the vehicle off.

Service advisers are telling customers they can virtually eliminate this possibility by taking several steps, including removing non-essential material from their key rings.

Ignition systems are designed to have "on" and "off" positions, and practically any vehicle can have power to a running engine cut off by inadvertently bumping the ignition from the run to accessory or off position.

GM's statement, however, was demonstrably false and misleading.

49. Contrary to GM's above-referenced statement, GM's internal testing documents showed that these incidents occurred when drivers were using keys with the standard key fob. GM knew that these incidents were not caused by heavy key chains or a driver's size and seating position. GM knew that removing the non-essential material from key rings would not "virtually eliminate" the possibility of inadvertent bumping of the ignition key from the "run" to the "accessory/off" position while the car is running.

50. GM's above-referenced statement was further demonstrably false and misleading because GM knew that these incidents were ultimately caused by the safety-related defects in the Key System identified in the February 2005 PRTS.

COMPLAINT AND DEMAND FOR JURY TRIAL -- 13

51.     But GM's affirmative concealment of the problems with the defective vehicles, including the Chevrolet Cobalt, did not end there.

52.     On July 29, 2005, Amber Marie Rose, a 16 year old Clinton, Maryland resident, was driving a 2005 Cobalt when she drove off the road and struck a tree head-on. Amber's driver's side frontal airbag did not deploy and she died as a result of the injuries she sustained in the crash.

53.     GM received notice of Amber's incident in September 2005 and opened an internal investigation file pertaining to this incident shortly thereafter.

54.     During its investigation of the incident, GM learned that the key in Amber's Cobalt was in the "accessory/off" position at the time of the crash.

55.     During its investigation of the incident in which Amber was killed in her Cobalt vehicle, GM also knew that the driver's side frontal airbag should have deployed given the circumstances of the crash.  Upon information and belief, GM subsequently entered into a confidential settlement agreement with Amber's mother.

56.     In a September 28, 2005, e-mail, John Hendler, another GM engineer, wrote:

> "I wanted to close the loop on the Electrical SMT's attempt to bring a new ignition switch design to the Delta/Kappa vehicles for MY 08. As the VSE for the Cobalt launch I am very aware of an issue with "inadvertent ignition offs" due to the low mounted ignition in the steering column and the low efforts required to rotate the ignition.
>
> A new, more robust, increased effort design is currently being implemented on the GMT 191 program for MY 07. My intention was to bring this part number common design to the Delta/Kappa vehicles for MY08. I attended an X Vapir

COMPLAINT AND DEMAND FOR JURY TRIAL -- 14

with the Delta team to review the pros/cons
of this change. The con of the change is that the piece
cost of the ignition switch went up around $0.90 and would
require $400K in tooling to add the almost 500K in volume.
At the X Vapir my team was challenged to offset the piece
cost with warranty savings and/or reduced PC/Inv. I
worked through Purchasing with Stoneridge Poliak to gain
the reductions. Stoneridge Poliak was unwilling to budge
on their PC/Inv. The warranty offset for the new switch is
in the $0.10-0.15 range.

It was felt by the Delta team that the revision of the slot
in the ignition key to a hole would significantly reduce
the inadvertent offs and make any additional changes.

Consequently, the ignition switch for the Deltas and Kappas
will remain the carryover single detent switch until the
piece cost hit can be eliminated or significantly reduced.
My plan is to resource this switch design for MY 09 and
make it available for the Deltas, Kappas , and the 19X
families."

Ray DeGiorgio, the lead design engineer for the Cobalt and Ion ignition switches, was

among the GM employees copied on this email.

57.     Hendler's e-mail shows that, as of September 28, 2005, GM engineers

continued to recognize that the "inadvertent ignition offs" were due to both the low-mounted

ignition switch in the steering column and the low effort required to rotate the ignition. It

also shows that, even as GM was implementing an improved ignition switch on another

vehicle line, it rejected implementing this ignition switch on Ions and Cobalts solely for

cost reasons even though the piece cost of the ignition switch was less than a dollar.

58.     In December 2005, shortly after it commenced its internal

investigation into the incident leading to Amber's death, GM issued a Technical

Service Bulletin (05-02-35-007) (the "TSB").

COMPLAINT AND DEMAND FOR JURY TRIAL -- 15

59.    The TSB, which GM affirmatively represented    applied to 2005-2006 Chevrolet Cobalts, 2006 Chevrolet HHRs, 2005-2006 Pontiac Pursuit, 2006 Pontiac Solstices, and 2003-2006 Chevrolet Cobalts, provided, "Information on inadvertent Turning of Key Cylinder, Loss of Electrical    System and no DTCs ," provided the following service information:

> There is potential for the driver to inadvertently turn off the ignition due to low ignition key cylinder torque/effort.
>
> The concern is more likely to occur if the driver is short and has a large and/or heavy key chain. In these cases, this condition was documents and the driver's knee would contact the key chain while the vehicle was
> turning and the steering column was adjusted all the way down. This is more likely to happen to a person who is short, as they have the seat positioned closer to the steering column.
>
> In cases that fit this profile, question the customer thoroughly to determine if this may the cause. The customer should be advised of this potential and should take steps to prevent it - such as removing unessential items from their key chain.
>
> Engineering has come up with an insert for the key ring so that it goes from a "slot" design to a hole design. As a result, the key ring cannot move up and down in the slot any longer - it can only rotate on the hole. In addition, the previous key ring has been replaced with a smaller, 13 mm (0.5 in) design. This will result in the keys not hanging as low as in the past.

60.    An image of the insert changing the "slot" design to a "hole" design was developed.

61.    As with its prior statement regarding the defective vehicles, the information GM provided in this TSB was also false and misleading.

COMPLAINT AND DEMAND FOR JURY TRIAL -- 16

62.     In the two PRTS's, GM issued before it issued the TSB, GM engineers never represented that short drivers or heavy key chains were the reasons why these incidents were happening.

63.     Indeed, at the time it issued the TSB, GM knew that these incidents were happening to drivers of all sizes using keys with the standard key fobs.

64.     In other words, GM knew these incidents were not caused by short drivers with heavy key chains, but because of the safety-related defects in the Key System of its defective vehicles, including the Chevrolet Cobalt.

65.     In 2005, GM began buying back Cobalts from certain customers who were experiencing engine stalling incidents.  GM never told the public, including Plaintiff, that it was buying back Cobalts under these circumstances.  GM refused to buy back Cobalts from other customers who had also experienced engine stalling incidents.  In fact, for many of the customers who complained about experiencing engine-stalling incidents, GM never informed these customers of the TSB and/or the availability of the key insert.

66.     On November 17, 2005, there was another incident involving a 2005 Cobalt in Baldwin, Louisiana.  In that incident, the Cobalt went off the road and hit a tree.  The frontal airbags did not deploy in this accident.  GM received notice of this accident, opened a file, and referred to it as the "Colbert" incident.

67.     On February 10, 2006, in Lanexa, Virginia, shortly after GM issued the TSB, a 2005 Cobalt flew off of the road and hit a light pole.  As with the Colbert incident (above), the frontal airbags failed to deploy in this incident as well.  The

COMPLAINT AND DEMAND FOR JURY TRIAL -- 17

download of the SDM (the vehicle's "black box") showed the key was in the "accessory/off" position at the time of the crash. GM received notice of this accident, opened a file, and referred to it as the "Carroll" incident.

68. On March 14, 2006, in Frederick, Maryland, a 2005 Cobalt traveled off the road and struck a utility pole. The frontal airbags did not deploy in this incident. The download of the SDM showed the key was in the "accessory/off" position at the time of the crash. G M received notice of this incident, opened a file, and referred to it as the "Oakley" incident.

69. In its February 24, 2014, letter to NHTSA regarding Recall No. 13454, GM, for the first time, acknowledged that changes were made to the ignition switches in the Defective Vehicles during the 2007 model year.

70. Specifically, in its letter of February 24, 2014, GM represented that "[o]n April 26, 2006, the GM design engineer responsible for the Cobalt's ignition switch signed a document approving changes to the ignition switch proposed by the supplier, Delphi Mechatronics. The approved changes included, among other things, the use of a new detent plunger and spring that increased torque force in the ignition switch." Ray DeGiorgio was the GM design engineer identified by GM in the letter. In fact, Mr. DeGiorgio signed a "General Motors Commodity Validation Sign-Off" confirming that he approved the ignition switch with the new detent plunger to increase torque force. At no time before February 24, 2014, did GM disclose this fact.

71. On August 1, 2006, following its receipt of a customer complaint about a Cobalt stalling while driving, GM opened yet another PRTS relating to this issue. GM

closed this PRTS on October 2, 2006, however, without taking any action.

72    In October 2006, GM updated the TSB (05-02-35-007) to include additional model years:  the 2007 Chevrolet Cobalt and Sky, 2007 Chevrolet HHR, 2007 Cobalt, and 2007 Pontiac Solstice and G5.  These vehicles had the same safety-related defects in the Key System as the vehicles in the original TSB.  All of the vehicles identified in the original TSB are hereinafter referred to as the "defective vehicles."

73.    On December 29, 2006, in Sellenville, Pennsylvania, a 2005 Cobalt drove off the road and hit a tree. The frontal airbags failed to deploy in this incident.  GM received notice of this incident, opened a file, and referred to it as the "Frei" incident.

74.    On February 6; 2007, in Shaker Township, Pennsylvania, a 2006 Cobalt sailed off the road and struck a truck.  Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. The download of the SDM showed the key was in the "accessory/off" position.  GM received notice of this incident, opened a file, and referred to it as the "White" incident.

75.    In August 2007, GM's met with its Sensing and Diagnostic Module ("SDM") supplier, Continental, to review SDM data from a crash of a 2005 Chevrolet Cobalt where the airbags failed to deploy.

76.    On August 6, 2007, in Cross Lanes, West Virginia, a 2006 Cobalt rear-ended a truck.  The frontal airbags failed to deploy. GM received notice of this incident , opened a file, and referred to it as the "McConnick" incident.

77.    In September 2007, the Chief of the Defect Assessment Division within the

Office of Defects Investigation ("ODI") of the National Highway Traffic Safety Administration ("NHTSA") e-mailed other ODI officials and proposed an investigation of "frontal airbag non-deployment in the 2003- 2006 Chevrolet Cobalt." This e-mail went on to state that the:

> ...issue was promoted by a pattern of reported non-deployments in VOQ [Vehicle Owners' Questionnaire] complaints that was first observed in early 2005. Since that time, [the Defects Assessment Division] has followed up on the complaints, enlisted the support of NCSA's Special Crash Investigations (SCI) team, discussed the matter with GM, and received a related EWD Referral. Notwithstanding GM's indications that they see no specific problem pattern, DAD perceives a pattern of non-deployments in these vehicles that does not exist in their peers . . . .

78.     This e-mail from the Chief of the Defect Assessment Division at NHTSA shows that, as of September 2007, GM was deliberately misleading NHTSA and concealing the defects in the Key Systems in the Defective Vehicles from NHTSA.

79.     On September 25, 2007, in New Orleans, Louisiana, a 2007 Cobalt lost control and struck a guardrail. Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. GM received notice of this incident, opened a file, and referred to it as the "Gathe" incident.

80.     On October 16, 2007, in Lyndhurst, Ohio, a 2005 Cobalt traveled off road and hit a tree. The frontal airbags failed to deploy. GM received notice of this incident, opened a file, and referred to it as the "Breen" incident.

81.     On April 5; 2008, in Sommerville, Tennessee, a 2006 Cobalt traveled off the road and struck a tree. Despite there being a frontal impact in this incident, the frontal

airbags failed to deploy. The download of the SDM showed the key was in the "accessory/off" position. GM received notice of this incident, opened a file, and referred to it as the "Freeman" incident.

82.     On May 21, 2008, in Argyle, Wisconsin, a 2007 G5 traveled off the road and struck a tree. Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. The download of the SDM showed the key was in the "accessory/off" position. GM received notice of this incident, opened a file, and referred to it as the "Wild" incident.

83.     On May 28, 2008, in Lufkin, Texas, a 2007 Cobalt traveled off the road and struck a tree. Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. GM received notice of this incident, opened a file, and referred to it as the "McDonald" incident.

84.     On September 13, 2008, in Lincoln Township, Michigan, a 2006 Cobalt traveled off the road and struck a tree. Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. GM received notice of this incident, opened a file, and referred to it as the "Harding" incident.

85.     On November 29, 2008, in Rolling Hills Estates, California, a 2008 Cobalt traveled off the road and hit a tree. Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. GM received notice of this incident, opened a file, and referred to it as the "Dunn" incident.

86.     On December 6, 2008, in Lake Placid, Florida, a 2007 Cobalt traveled off the road and hit a utility pole. Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. The download of the SDM showed the key was in

COMPLAINT AND DEMAND FOR JURY TRIAL -- 21

the "accessory/off" position . GM received notice of this incident, opened a file, and referred to it as the "Grondona" incident.

87.     In February 2009, GM opened yet another PRTS with respect to the Defective Vehicles -this time to investigate why the slot in the key in Cobalts allowed the key chain to hang too low in the vehicles, as well as the inadvertent shutting off of the vehicles.

88.     Through this PRTS, GM determined that changing the key from a slot to a hole would significantly reduce the likelihood of inadvertent turning off the ignition switch.

89.     In March 2009, GM approved of the design change in the key from the slot to a hole. According to GM, this redesigned change was implemented in model year 2010 Cobalts. GM, however, chose not to provide these redesigned keys the owners or lessees of any of the vehicles implicated in the TSB, including the 2005 Cobalt.

90.     This timeline gives a short overview of some key points between 2004 and the present, as discussed above.

91.     Throughout this entire time period, GM was selling the Defective Vehicles to consumers for full price, and consumers were purchasing them believing that the vehicles were non-defective, but all the while GM was concealing the extent and nature of the defects in the Defective Vehicles.

### Old GM's Marketing Represented to the Public
### that the Defective Vehicles Were Safe

92.     In a section called "safety," Old GM 's Chevrolet website stated:

COMPLAINT AND DEMAND FOR JURY TRIAL -- 22

OUR COMMITMENT

Your family's safety is important to us. Whether it's a short errand around town or a cross-country road trip, Chevrolet is committed to keeping you and your family safe- from the start of your journey to your destination. That's why every Chevrolet is designed with a comprehensive list of safety and security features to help give you peace of mind. Choose from the safety features·below to learn more about how they work, and which Chevy vehicles offer them.

93.     Similarly, old GM promoted its Cobalt vehicle line on television with statements like "Putting people first," and representing that its vehicles were safe.

94.     Cobalt's print ad campaign featured advertisements like the following, which stated, among other things, "Need is where you begin. In cars, it's about things like reliability, durability and, of course, safety. That's where we started when developing our new line of cars":

95.     In sum, in order to increase sales, old GM touted the safety of its vehicles.

96.     But, when the time came for the company to stay true to its words, GM did not disclose its knowledge about the dangerous Key System defects to its customers.

97.     In 2009, GM declared bankruptcy, and, weeks later, it emerged from bankruptcy. Both before and after GM's bankruptcy, the Key Systems in the Defective Vehicles continued to fail and GM continued to conceal the truth.

98.     On May 15, 2009, GM again met with Continental and requested that Continental download SDM data from a 2006 Chevrolet Cobalt accident where the airbags failed to deploy.

COMPLAINT AND DEMAND FOR JURY TRIAL -- 23

99.    On March 10, 2010, Brooke Melton was driving her 2005 Cobalt on a two-lane highway in Idaho. While she was driving, her key turned from the "run" to the "accessory/off" position causing her engine to shut off. After her engine shut off, she lost control of her Cobalt, which traveled into an oncoming traffic lane, where it collided with an oncoming car. Brooke was killed in the crash.

100.    On March 22, 2011, Ryan Jahr, a GM engineer, downloaded the SDM from Brooke's Cobalt. The information from the SDM download showed that the key in Brooke's Cobalt turned from the "run" to the "accessory/off" position 3-4 seconds before the crash. On June 24, 2011, Brooke Melton's parents, Ken and Beth Melton, filed a lawsuit against GM.

101.    On December 31, 2010, in Rutherford County Tennessee, a 2006 Cobalt traveled off the road and struck a tree. Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. The download of the SDM showed the key was in the "accessory/off" position. GM received notice of this incident, opened a file, and referred to it as the "Chansuthus" incident.

102.    On December 31, 2010, in Harlingen, Texas, a 2006 Cobalt traveled off the road and struck a curb. Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. GM received notice of this incident, opened a file, and referred to it as the "Najera" incident.

103.    On December 18, 2011, in Parksville, South Carolina, a 2007 Cobalt traveled off the road and struck a tree. Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. The download of the SDM showed the

COMPLAINT AND DEMAND FOR JURY TRIAL -- 24

key was in the "accessory/off" position.  GM received notice of this incident, opened a file, and referred to it as the "Sullivan" incident.

104.   These incidents are not limited to vehicles of model year 2007 and before.  According to GM's own investigation, there have been over 250 crashes involving 2008-2010 Chevrolet Cobalts in which the airbags failed to deploy.  The Key System is the same as in Plaintiff's Chevrolet Cobalt.

## GM Investigates Further, but Continues to Conceal the Defect

105.   In 2010, GM began a formal investigation of the frontal airbag non-deployment incidents in Chevrolet Cobalts and Pontiac G5s.  GM subsequently elevated the investigation to a Field Performance Evaluation ("FPE").

106.   In August 2011, GM assigned Engineering Group Manager, Brian Stouffer as the Field Performance Assessment Engineer ("FPAE") to assist with the FPE investigation.

107.   In spring 2012, Stouffer asked Jim Federico, a high level executive and chief engineer at GM, to oversee the FPE investigation.  Federico was the "executive champion" for the investigation to help coordinate resources for the FPE investigation.

108.   In May 2012, GM engineers tested the torque on the ignition switches for 2005-2009 Cobalts, 2007 and 2009 Pontiac GS, 2006-2009 HHR, and 2003-2007 Ion vehicles in a junkyard.  The results of these tests showed that the torque required to turn the ignition switches in most of these vehicles from the "run" to the "accessory/off" position did not meet GM's minimum torque specification requirements, including the 2008-2009 vehicles.  These results were reported to Stouffer and other members of the

FPE.

109.   In September 2012, Stouffer requested assistance from a "Red X Team" as part of the FPE investigation. The Red X Team was a group of engineers within GM assigned to find the root cause of the airbag non-deployments in frontal accidents involving Chevrolet Cobalts and Pontiac G5s. By that time, however, it was clear that the root cause of the airbag non-deployments in a majority of the frontal accidents was the defective Key System. The Red X Team became involved in the investigation shortly after Mr. Stouffer's request.

110.   During the field-performance-evaluation process, GM determined that, although increasing the detent in the ignition switch would reduce the chance that the key would inadvertently move from the "run" to the "accessory/off" position, it would not be a total solution to the problem.

111.   Indeed, the GM engineers identified several additional ways to actually fix the problem. These ideas included adding a shroud to prevent a driver's knee from contacting the key, modifying the key and lock cylinder to orient the key in an upward facing orientation when in the run position, and adding a push button to the lock cylinder to prevent it from slipping out of run. · GM rejected each of these ideas.

112.   GM intentionally chose to not recall its defective products.

113.   These photographs show the dangerous condition of the position of the key in the lock module on the steering column, as well as the key with the slot, which allow the key fob to hang too low off of the steering column. GM engineers understood that the key fob may be impacted and pinched between the driver's knee and the

COMPLAINT AND DEMAND FOR JURY TRIAL -- 26

steering column which causes the key to be inadvertently turned from the run to accessory/off position. The photographs show why the GM engineers understood that increasing the detent in the ignition switch would not be a total solution to the problem. It also shows why GM engineers believed that the additional changes to the Key System (such as the shroud) were necessary to fix the defects with the Key System.

114. The GM engineers clearly understood that increasing the detent in the ignition switch alone was not a solution to the problem but GM concealed- and continued to conceal – from the public, the nature and extent of the defects.

115. By 2012, Federico, Stouffer, and the remaining members of the Red X Team knew that the Key System in the Ion, the Cobalt, and the 2005 vehicles had safety-related defects that would cause the key to move from the "run" to the "accessory/off" position while driving these vehicles. They also knew that when this happened the airbags would no longer work in frontal crashes.

116. Federico, Stouffer, and the other members of the Red X Team also understood that these safety-related defects had caused or contributed to numerous accidents and multiple fatalities. Despite this knowledge, GM chose to conceal this information from the public, NHTSA, and Plaintiffs.

117. Under 49 C.F.R. §573.6, GM had a duty in 2012 to disclose the safety-related defects in the Ion, Cobalt, and 2005 vehicles. Rather than comply with their legal obligations, GM continued to fraudulently conceal these defects from the public and the U.S. government.

118. In December 2012, in Pensacola, Florida , Ebram Handy, a GM

COMPLAINT AND DEMAND FOR JURY TRIAL -- 27

engineer, participated in an inspection of components from Brooke Melton's Cobalt, including the ignition switch. At that inspection, Handy, along with Mark Hood, a mechanical engineer retained by the Meltons, conducted testing on the ignition switch from Brooke Melton's vehicle, as well as a replacement ignition switch for the 2005 Cobalt.

119.    At that inspection, Handy observed that the results of the testing showed that the torque performance on the ignition switch from Brooke Melton's Cobalt was well below GM's minimum torque performance specifications. Handy also observed that the torque performance on the replacement ignition switch was significantly higher than the torque performance on the ignition switch in Brooke Melton's Cobalt.

120.    In January 2013, Handy, in preparation for his Rule 30(b)(6) deposition in the Melton case, spoke with several GM engineers, including DeGiorgio and Stouffer. At that time, Handy knew that, based on the testing he had observed, the original ignition switch in the 2005 Cobalt failed to meet GM's minimum torque performance specifications and that GM had redesigned the ignition switches that were being sold as replacement switches. GM knew that an ignition switch that did not meet its minimum torque performance requirements was a safety-related defect.

121.    GM engineers integrally involved with this situation have admitted that GM never should have sold the Defective Vehicles with ignition switches that did not meet its minimum torque performance requirements.

122.    On June 12, 2013, Mr. Altman, the Cobalt program engineering manager , testified as follows during his deposition in Melton v. GM:

Q. And the vehicle never should have been sold if it didn't meet GM's minimum torque specific – performance requirements, should it?

MR. FRANKLIN:   Object to form.
THE WITNESS:  That's correct.
Q.    And the reason is is [sic] because that could be dangerous under certain situations, because the key can move from run to accessory?

MR. FRANKLIN:  Object to form.

THE WITNESS:  Yes.

123.    On February 7, 2014, GM, in a letter from Carmen Benavides, Director – Product Investigations and Safety Regulations for GM, informed NHTSA that it was conducting Recall No. 13454 for certain 2005-2007 model year Chevrolet Cobalts and 2007 model year Pontiac G5 vehicles.

124.    In its February 7, 2014, letter to NHTSA, GM represented that, as replacement ignition switches became available, GM would replace the ignition switches on the Defective Vehicles.

125.    On February 19, 2014, a request for timeliness query of General Motors' Safety Recall 13454 was sent to NHTSA. The timeliness query pointed out that GM had failed to recall all of the vehicles with the defective ignition switches.

126.    The February 19, 2014, request for timeliness query also asked NHTSA to investigate GM's failure to fulfill its legal obligation to report the safety-related defects in the Defective Vehicles to NHTSA within five days of discovering the defect.

127.    On February 24, 2014, GM sent a letter to Ms. Benavides and informed

NHTSA it was expanding the recall to include 2006-2007 model year (MY) Chevrolet

IlliR and Pontiac Solstice, 2003-2007 MY Chevrolet Cobalt, and 2007 MY Saturn Sky

vehicles.

128.    On March 17, 2014, Mary T. Barra, GM' chief executive officer issued an

internal video, which was broadcast to employees. In the video, Ms. Barra admitted:

> Scrutiny of the recall has expanded beyond the review by the
> federal regulators at NHTSA , the National Highway Traffic
> Safety Administration.    As of now, two congressional
> committees have announced that they will examine the issue.
> And it's been reported that the Department of Justice is
> looking into this matter .... **These are serious developments
> that shouldn't surprise anyone.** After all, **something went
> wrong with our process in this instance and terrible things
> happened** .· . . The bottom line is, **we will be better because
> of this tragic situation,** if we seize the opportunity .... I ask
> everyone to stay focused on making today's GM the best it can
> be.

129,    On March 28, 2014, GM again expanded the ignition switch recall to cover

all model years of the Chevrolet Cobalt and HHR, the Pontiac G5 and Solstice and the

Chevrolet Cobalt and Sky in the United States. According to reports, this second expansion

of the ignition switch recall covers an additional 824,000 vehicles in the U.S., bringing the

number of recalled vehicles to 2,191,146.

130.    Not only is GM's recall ten years too late, especially for Plaintiff, it

remains completely insufficient to correct the safety-related defects in the Defective

Vehicles.

131.    Since at least 2005, GM has known that simply replacing the ignition

switches on the Defective Vehicles is not a complete solution to the potential for the

key to inadvertently turn from the "run" to the "accessory/off" position in these

COMPLAINT AND DEMAND FOR JURY TRIAL -- 30

vehicles.

132.    Additionally, GM's recall fails to address the design defect that causes the key fob/chain to hang too low on the steering column.

133.    Thus, even when the ignition switches are replaced, this defective condition would still exist in the Defective Vehicles and there continues to be the potential for a driver to contact the key chain and inadvertently turn the key from the "run" to the "accessory/off" position.

134.    The recall is further insufficient, because, through this recall, GM is not replacing all of the keys in the Defective Vehicles with the redesigned key with a hole instead of a slot. GM provided these keys to owners/lessees of the 2010 Cobalt with the understanding that the redesigned key would reduce the chance that the key could be inadvertently turned from the "run" to the "accessory/off" position.

135.    The recall also fails to address the design defects in the Defective Vehicles which disables the airbag immediately upon the engine shutting off.

136.    Although GM contends that it changed the ignition switch in some 2007 Cobalts and all of the 2008-2010 Cobalts, there continue to be non- deployment events in the later model Cobalts. Undermining GM 's position is GM's own investigation into the non-deployment events in the later model Cobalts. Undermining GM's position is GM's own investigation into the non-deployment events in Cobalts indentified over 250 non-deploy crashes involving 2008-2010 Cobalts.

137.    GM's engineers understood that increasing the detent in the ignition switch alone was not a solution to the problem, but GM concealed from the

COMPLAINT AND DEMAND FOR JURY TRIAL -- 31

consuming public, including Plaintiff, the nature and extent of the Key System defects, which the current recall will not cure.

### IV. Claims Against GM

Plaintiff asserts the following claims against GM:

### Count One: Strict Liability

138.   All preceding statements and allegations of Plaintiffs' Complaint are incorporated herein and realleged as if expressly set forth herein.

139.   GM designed, selected, inspected, tested, manufactured, assembled, equipped, marketed, distributed and sold the Chevrolet Cobalt, and its components, including but not limited to, equipping it with the Key System.

140.   GM designed, selected, inspected, tested, manufactured, assembled, equipped, marketed, distributed and sold the Key System which was selected and installed in the Chevrolet Cobalt.

141.   GM sold the 2005 Chevrolet Cobalt as a new product more than ten years before the filing of this action, but any statutes of repose or limitation are tolled because of GM's fraud and fraudulent concealment, and conduct equivalent to that required to impose punitive damages against GM.

142.   GM had a legal duty to design, inspect, test, manufacture and assemble the Chevrolet Cobalt so that it would be reasonably crashworthy and provide a reasonable degree of occupant safety in foreseeable collisions occurring in the highway environment of its expected use.

143.   Among other things, the 2005 Chevrolet Cobalt is not crashworthy, is

defective, and is unreasonably dangerous and unsafe for foreseeable users and occupants in each of the following particulars:

(a)   having a Key System that is inadequately designed and constructed, and located, which may result in the key moving from the run to accessory/off position during normal driving maneuvers; .

(b)   having a Key System that allows the Chevrolet Cobalt to stall or lose engine power , and steering and/or full braking ability while driving;

(c)   having frontal airbags that do not deploy when the key is in the accessory/off position; and

(d)   failing to adequately warn Plaintiff, other consumers, or the public in general , about the unsafe and defective condition and design of the vehicle known to GM, so that individuals like Plaintiff could make informed and prudent decisions regarding traveling near or riding in such vehicles.

144.   The defective nature of the Chevrolet Cobalt was the proximate cause of the damages sustained by Plaintiff, as set forth herein, thus rendering GM strictly liable.

## Count Two: Negligence

145.   All preceding statements and allegations of Plaintiff's Complaint are incorporated herein and realleged as if expressly set forth herein.

146.   GM was negligent in designing, inspecting, testing, manufacturing, assembling, marketing, selling and providing warnings for the Chevrolet Cobalt, as set out in the paragraphs above.

COMPLAINT AND DEMAND FOR JURY TRIAL -- 33

147.   GM's negligence proximately caused the damages sustained by Plaintiff, as set forth herein.

## Count Three: Breach of Implied Warranty

148.   All preceding statements and allegations of Plaintiffs' Complaint are incorporated herein and realleged as if expressly set forth herein.

149.   GM breached its implied warranty of merchantability by selling the Chevrolet Cobalt when it was not fit for the ordinary purpose for which such goods are sold.

150.   This breach of warranty proximately caused the damages sustained by Plaintiff, as set forth herein.

## Count Four:   Fraud and Fraudulent Concealment

151.   All preceding statements and allegations of Plaintiffs' Complaint are incorporated herein and realleged as if expressly set forth herein.

152.   GM intentionally concealed material facts from Plaintiff, the consuming public, and the NHTSA. GM knew that the Defective Vehicles were designed and manufactured with Key System defects, but GM concealed those material facts. Although the Defective Vehicles contain safety-related defects that GM knew of, or should have known of, at the time of distribution, GM recklessly manufactured and distributed those vehicles to consumers in the United States. Those consumers had no knowledge of the safety-related defects.

153.   GM had a duty to disclose the facts to Plaintiff and the Van Pelts, the public who owned defective GM cars or traveled the roads and highways with those vehicles, and

COMPLAINT AND DEMAND FOR JURY TRIAL -- 34

the NHTSA but failed to do so.

154.   GM knew or should have known that Plaintiff had no knowledge of those facts and that Plaintiff did not have an equal opportunity to discover the facts. GM was in a position of superiority over Plaintiff and the Van Pelts. Indeed, Plaintiff and the Van Pelts trusted GM not to sell them a vehicle that was defective or that violated federal law governing motor vehicle safety. Plaintiff and the Van Pelts further trusted GM to warn of defects and to recall defective vehicles.

155.   By failing to disclose these material facts, GM intended to induce Plaintiff and the Van Pelts to purchase the Chevrolet Cobalt and/or to continue to use and drive it. GM further intended to induce NHTSA not to recall the Van Pelts' Chevrolet Cobalt, as well as the other defective vehicles in order to reduce its eventual financial exposure.

156.   Plaintiff reasonably relied on GM's nondisclosure and reasonably but unknowingly continued to drive on roads and highways with defective Chevrolet Cobalts until the date of the subject wreck on October 18, 2013.

157.   Prior to the subject wreck, Plaintiff had no knowledge the Key System defect.

158.   GM reaped the benefit of the sales and leases of Defective Vehicles as a result of its nondisclosure to the public and to the NHTSA. Additionally, in not disclosing the Key System defects, GM helped prevent any meaningful investigation of many wrecks and collisions that were likely the result of those defects. Further, because GM had not placed this matter before the NHTSA or the public, cars and

COMPLAINT AND DEMAND FOR JURY TRIAL -- 35

components in those other similar wrecks were disposed of without the appropriate and adequate investigations.

159.    As a direct and proximate result of GM's wrongful conduct and fraudulent concealment, Plaintiff suffered the damages described herein, including, but not limited to, personal injuries and lost income.

160.    GM's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiff.

### Attorney Fees and Expenses

161.    All preceding statements and allegations of Plaintiff's Complaint are incorporated herein and realleged as if expressly set forth herein.

162.    GM's actions have been in bad faith and have caused Plaintiff to suffer unnecessary trouble and expense.  Plaintiff is, therefore, entitled to recover from GM all expenses of litigation, including · attorney fees and costs and expenses.

### Damages

163.    All preceding statements and allegations of Plaintiff's Complaint are incorporated herein and realleged as if expressly set forth herein.

164.    Plaintiff suffered severe, personal injuries and other economic and noneconomic losses as a result of GM's wrongful and illegal conduct as set forth herein.

165.    Plaintiff has standing to recover the general damages and special damages that Plaintiff suffered.

166.    As a direct and proximate result of the negligence and misconduct of GM, as well as the defective, unsafe and unreasonably dangerous Chevrolet Cobalt,

COMPLAINT AND DEMAND FOR JURY TRIAL -- 36

Plaintiff experienced physical pain and suffering and the medical bills.

167. As a direct and proximate result of the negligence, misconduct, and illegal conduct of GM, as well as the defective, unsafe and unreasonably dangerous Chevrolet Cobalt, Plaintiff experienced mental, emotional, and physical pain and suffering.

### Prayer For Relief

Plaintiff demands judgment and other relief as follows:

a. Judgment against GM in an amount sufficient to fully and fairly compensate Plaintiff for Plaintiff's physical, mental, and emotional injuries, his current and past medical bills, and all of his general and special damages, both economic and noneconomic in nature;

a. Reasonable attorney fees;

b. Trial by jury; and

c. Such other relief as this Court deems just and proper under the circumstances.

DATED: This 16th day of October, 2015.

JOHNSON & MONTELEONE, L.L.P.

Jason R.N. Monteleone
Attorney for Plaintiff

COMPLAINT AND DEMAND FOR JURY TRIAL -- 37

## DEMAND FOR JURY TRIAL

Pursuant to I.R.C.P. 38(b), Plaintiff hereby demands a trial by jury on any and all issues properly triable by a jury in this action.

DATED: This _16_ day of October, 2015.

JOHNSON & MONTELEONE, L.L.P.

Jason R.N. Monteleone
Attorneys for Plaintiff

COMPLAINT AND DEMAND FOR JURY TRIAL -- 38